UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| V. § | |
| § | No. 4:19-CR-00196-O-1 |
| MICHAEL WEBB, § | |
| § | |

DEFENDANT'S MOTION TO DISMISS

TO THE HONORABLE REED C. O'CONNOR, UNITED STATES DISTRICT JUDGE FOR THE WESTERN DISTRICT OF TEXAS:

Michael Webb, through undersigned counsel, respectfully files this motion to dismiss the indictment. In support of Mr. Webb's motion, Counsel for Defendant asserts that the following is true to the best of his knowledge and belief:

**I.     PROCEDURAL BACKGROUND**

On June 19, 2019, Mr. Webb was charged by indictment with one count of kidnapping, in violation of 18 U.S.C. § 1201(a)(1) and (g). On June 24, 2019, Mr. Webb pleaded not guilty at his arraignment hearing. He is currently detained pending his trial, which is scheduled for September 23, 2019.

**II.    ARGUMENT**

The Constitution grants Congress the power to "regulate Commerce with foreign nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3.  In part, Congress may use this grant of authority "to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *United States v. Lopez*, 514 U.S. 549, 558 (1995) (citing *Shreveport Rate Cases*, 234 U.S. 342 (1914); *Southern R. Co. v. United States*, 222 U.S. 20

(1911)). Along those lines, the statute charged in this case—18 U.S.C. § 1201(a)(1)—has been upheld as constitutional. Section 1201(a)(1) requires the United States to prove that Mr. Webb, "in furtherance of the commission of the" charged kidnapping, "used any means, facility, [or] instrumentality of interstate [or] foreign commerce." *See* Indictment at 1, *United States v. Michael Webb*, No. 4:19-CR-196-O (N.D. Tex. June 19, 2019). As described above, Congress has the power to regulate means, facilities, and instrumentalities of interstate commerce, and this fact has been sufficient to insulate § 1201(a)(1) from successful Commerce Clause challenges. *See, e.g.*, *United States v. Morgan*, 748 F.3d 1024, 1031 (10th Cir. 2014); *United States v. Davis*, 2019 WL 447249, at *2-3 (N.D. Ill. Feb. 5, 2019).

As the law stands, these holdings are undoubtedly correct. According to the Supreme Court, "[t]he power of Congress over the instrumentalities of interstate commerce is plenary." *Cleveland v. United States*, 329 U.S. 14, 19 (1946). In turn, this power "may be used to defeat what are deemed to be immoral practices." *Id*. Given these premises, Congress may rely on the Commerce Clause to forbid the use of an instrumentality of interstate commerce—say, a telephone—to facilitate an immoral act—in this case, a kidnapping. *See, e.g.*, *United States v. Ochoa*, 2009 WL 3878520, at *3 (D.N.M. Nov. 12, 2009).

Mr. Webb nevertheless challenges these premises as unfounded. In the late Eighteenth Century, a leading legal dictionary defined the noun "commerce" as follows: "Traffick, Trade or Merchandise in Buying and Selling of Goods." *Commerce*, A NEW LAW-DICTIONARY (8th ed. 1762). Samuel Johnson's dictionary, published around the same time for a lay audience, employed a similar definition: "Intercourse; exchange of one thing for another; interchange of any thing; trade; traffick." This definition tracked those found in other popular dictionaries, and the term "commerce" was typically defined with reference to both "trade" and "traffic."

*Commerce*, A NEW GENERAL ENGLISH DICTIONARY (13th ed. 1778); *Commerce*, AN UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (20th ed. 1763). What about the verb "regulate"? During the Founding Era, lay dictionaries defined the term as setting rules of order. *See Regulate*, A DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773) ("To adjust by rule or method."); *Regulate*, AN UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (20th ed. 1763) ("To set in order; to govern, direct, or guide."); *Regulate*, A NEW GENERAL ENGLISH DICTIONARY (13th ed. 1778) ("To put in order; set to rights, govern, or keep in order."). The power to "regulate Commerce" thus encompassed the power to *make rules* governing the *trade* of goods, along with the *traffic* necessary to accomplish such trade.

In *Gibbons v. Ogden*, the Supreme Court faithfully applied these definitions. The opinion defined the "subject" of the Commerce Clause as follows: "the commercial intercourse between nations, and parts of nations." *Gibbons v. Ogden*, 22 U.S. 1, 189-90 (1824). The Clause thus covered both trade—"buying and selling"—and traffic—there, the "navigation" of the nation's waterways. *Id*. at 189. After defining the subject, the Supreme Court delineated the power granted: "It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed." *Id*. at 196. This power belonged to Congress and Congress alone, so in *Gibbons*, the Supreme Court struck down a New York statute setting navigation requirements for boats carrying out commerce. *Id*. at 213-17.

How did the Supreme Court understand this power as it extended to instruments of interstate commerce? For one, Congress could regulate those instruments to ensure the "safety" and "efficiency" of interstate traffic. *Shreveport Rate Cases*, 234 U.S. at 836. Congress could also set rules to maintain the "conditions under which interstate commerce may be conducted upon fair terms." *Id*. Pursuant to this power, Congress can ensure that railroad routes—even

3

those used for intrastate traffic—are not subject to discriminatory rates. *Id*. at 353-54. In similar fashion, Congress can set safety requirements for all train cars, even for those moving along intrastate lines. *Southern R. Co.*, 222 U.S. at 26-27. After all, train cars engaged in both interstate and intrastate traffic "are frequently commingled in the same train," and "the absence of appropriate safety appliances for any part of any train is a menace not only to that train but to others." *Id*. at 27. Finally, Congress could criminalize the theft of goods from vessels moving in interstate commerce, as the power to regulate commerce "extends to such acts . . . which interfere with, obstruct, or prevent" such traffic. *United States v. Coombs*, 37 U.S. 72, 78 (1838).

The cases foreclosing Mr. Webb's challenge go further. In *Hoke v. United States*, for example, the Supreme Court upheld a federal law prohibiting the transportation "in interstate or foreign commerce" of "any woman or girl for the purpose of prostitution of debauchery." 227 U.S. 308, 317-18 (1913). The statute was constitutional, the Supreme Court explained, because "Congress has power over transportation" and could therefore prohibit the use of any "facility of interstate transportation" in furtherance of prostitution. *Id*. at 322-23. From this broad analysis, courts have adopted a rule that allows Congress to criminalize the use of any instrument based on its interstate "nature" and without regard to whether the underlying conduct prohibited is, in fact, commercial. *See, e.g.*, *United States v. Marek*, 238 F.3d 310, 317 (5th Cir. 2001) (*en banc*).

These cases are wrongly decided. The power "to prescribe the rule by which commerce is to be governed," *Gibbons*, 22 U.S. at 196, may be employed to properly regulate the instruments of interstate commerce in so far as those instruments are used to circulate goods bought and sold in the course of such commerce. Congress may protect those instruments from intrastate activities designed to hinder such commerce. *Shreveport Rate Cases*, 234 U.S. at 836. Congress may also promote the safety of those goods. *Southern R. Co.*, 222 U.S. at 26-27;

4

*Coombs*, 37 U.S. at 78.  § 1201(a)(1) does neither and instead relies on the regulation of such instruments—the Internet, a telephone, a car, *et cetera*—as a pretext to punish an activity—kidnapping—with no connection to commerce at all.  Properly understood, § 1201(a)(1) thus exceeds Congress's power to regulate commerce.

This claim is foreclosed.  Counsel may nevertheless advance a good-faith argument for reversing existing authority.  *See* MODEL RULES OF PROF'L CONDUCT 3.1 (Am. Bar Ass'n 2019). Counsel does so above with the goal of preserving the issue for appellate review.  *See, e.g.*, *United States v. Vite-Garcia*, 749 F. App'x 290, 291 (5th Cir. 2019).

### III.   CONCLUSION

Accordingly, based on the foregoing, Mr. Webb, through counsel, respectfully requests that the indictment in this case be dismissed.

Respectfully submitted,

JASON HAWKINS
Federal Public Defender
Northern District of Texas


/s/ John J. Stickney
JOHN J. STICKNEY
Assistant Federal Public Defender
MA Bar No. 687134
819 Taylor Street, Room 9A10
Fort Worth, Texas 76102
817.978.2753
John_J_Stickney@fd.org

## Certificate of Conference

I, John Stickney, hereby submit the following certificate of conference. Undersigned counsel conferred with AUSA Aisha Saleem on September 3, 2019. The Government opposes this motion to dismiss.

## Certificate of Service

I, John Stickney, hereby certify that on September 3, 2019, I electronically filed the Motion to Dismiss with the clerk for the U.S. District Court, Northern District of Texas, using the electronic filing system for the Court. The electronic case filing system sent a "Notice of Electronic Filing" to AUSA, Aisha Saleem.

/s/ John J. Stickney
John J. Stickney
Assistant Federal Public Defender